# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 1:21-cr-00496-TJK-1** |
| | : | |
| | : | |
| **MARK S. IBRAHIM** | : | |
| | : | |
| **Defendant.** | : | |

## OPPOSITION TO THE MOTION TO DISMISS THE INDICTMENT (ECF No. 21)

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant Mark Ibrahim's Motion to Dismiss the Indictment based upon his claim that the indictment violates the First and Fifth Amendments of the United States Constitution and Rule 7(c)(1) of the Federal Rules of Criminal Procedure.

Defendant Ibrahim presses two types of claims in his motion.   First, he advances several arguments—a First Amendment claim, a selective prosecution claim, and a corresponding vindictive prosecution claim—that are ripe for resolution at this point in the litigation Those claims are not supported factually or legally and should be denied.   Second, he presses several claims—that he was entrapped, that he may assert a necessity defense, and that he did not act with the requisite mental state—that are not a basis to dismiss the indictment. In any event, those claims also lack merit.

Ibrahim is charged via indictment with offenses related to crimes that occurred at the United States Capitol on January 6, 2021.   Specifically, Ibrahim is charged with violations of 18 U.S.C. §§ 1752(a)(l) and (b)(l)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon), 40 U.S.C. § 5104(d)(2)(F) (injuries to property), 40 U.S.C. § 5104(e)(1)(A)(i) (Firearms and Dangerous Weapons on Capitol Grounds), and 18 U.S.C. § 1001(a)(2) (False Statements and Representations).   Ibrahim does not dispute that he

was present on Capitol Grounds and Restricted Grounds armed with a deadly weapon, his DEA-issued firearm. Ibrahim also concedes that he climbed upon the Peace Monument. Rather, Ibrahim argues that he did not act with a culpable *mens rea* while engaged in that conduct. Ibrahim also disputes that he intentionally made a materially false, fictitious, and fraudulent statement or representation to a federal officer.

## FACTUAL BACKGROUND

The U.S. Capitol was closed to all members of the public on January 6, 2021. Moreover, The USCP actively cordoned off the area around the U.S. Capitol on January 6, 2021 to prevent people from interfering with the Electoral College Certification process. The area was barricaded with bicycle racks, fencing, and Area Closed signs. Nevertheless, rioters broke through the clearly marked barricades and stormed the Capitol. *See* Figures 1 and 2.



Figure 1



Figure 2

On January 6, 2021, Ibrahim was a probationary Special Agent with the Drug Enforcement Administration and at all times relevant to the below chronology, was carrying his DEA-issued firearm and was off duty. Ibrahim had, on December 4, 2020 given "Notification of Resignation" stating that his last day on the job would be January 29, 2021. On January 25, 2021, Ibrahim sent a notice to the DEA to inform them that he was rescinding his resignation, effective immediately. On January 6, 2021, Ibrahim was on personal leave from the DEA. He was not on duty for the DEA and had no role as a law enforcement officer on the Capitol

2

Grounds.    The DEA was not providing assistance to defend the Capitol and DEA agents were not assigned to defend the Capitol.

*Ibrahim's Actions at the United States Capitol on January 6, 2021*

At approximately 12:53 p.m., the crowd began to break down the fencing and bicycle-rack style barricades at the foot of the U.S. Capitol Grounds and entered the Grounds. Below is a frame taken from a video posted to the internet at approximately 12:53 p.m. showing the fencing and the cordoned-off area. Signs indicating that the area was closed by order of the U.S. Capitol Police Board were posted at regular intervals; they can be identified as the white squares on the fencing in the image in Figure 3 below.    A close-up of a sign is also attached below as Figure 4. An approximate outline of the barricaded Capitol is included below as Figure 5.





Figure 3                    Figure 4                    Figure 5

Historical cell-site data shows defendant Ibrahim arriving in the area of the U.S. Capitol Grounds at approximately 1:06 p.m.    At approximately 1:09 p.m., Ibrahim was photographed displaying his DEA badge and firearm.    Figure 6 shows one of these photographs. Figure 7 shows the approximate location of Ibrahim near Capitol Grounds.

3




Figure 6                                     Figure 7

The photographs are of such high resolution that the serrations on the slide of Ibrahim's DEA

firearm are visible. Figure 8 is a crop of the photo above showing Ibrahim's badge and firearm.



Figure 8

4

Throughout the day, Ibrahim had been texting with some DEA colleagues using the WhatsApp group chat.    At approximately 1:22 p.m., a colleague messaged "Mark, you in DC stirring shit with the other Republicans?"    Starting as 1:34 p.m., another messages the following:





Figure 9                                    Figure 10

At approximately 1:45 p.m., Ibrahim can be seen approximately 400 feet inside the first set of fencing and barricades shown above. A second cordoned-off area with similar fencing can be seen in the background behind Ibrahim.    His approximate location on Capitol Grounds is attached as Figure 11.



Figure 11

At approximately 1:57 p.m., the barricades on the northeast side of the Capitol were pulled apart by the crowd. A video posted to the internet shows the crowd pulling apart the barricades; a frame from this video is attached below as Figure 12.



Figure 12

At 1:59 p.m., a video was posted to the internet in which Ibrahim and his brother can be seen walking on the lawn of the Capitol Grounds along the north side of the Capitol Building heading toward the northeast side of the Capitol.    At 2:02 p.m. security camera footage shows Ibrahim and his brother near the northeast side of the Capitol grounds.    A frame from this security camera footage is included as Figure 13 below.    Defendant Ibrahim is identified with an arrow labeled "2" and his brother, who is a Special Agent with the Federal Bureau of Investigation (FBI), is identified with an arrow labeled "1" in Figure 13 below.



Figure 13

6

At approximately 1:58 p.m., Ibrahim was photographed standing in front of one of the barricades surrounding the Capitol. See Figure 14.   His approximate location is shown in Figure 15.



Figure 14



Figure 15

At approximately 1:57 p.m, someone in the group chat messages "Seriously though, anybody in DC today?   Ibrahim, who had been participating in the WhatsApp group chat with at least five other law enforcement officers, posted the photograph of himself (Figure 14) standing in front of the barricade at 2:06 p.m.   On minute later, a DEA colleague responds "Question Mark, you are carrying your duty weapon and your badge/creds?"



Figure 16

At no time during the WhatsApp group chat conversation does Ibrahim state or suggest that he was there to "determine if there was anyone in need of aid or if there was anything he could do to help law enforcement in the midst of the emergency situation."   *See* ECF No. 21, pg. 29.   A video posted to the internet at approximately 2:06 p.m. captured Ibrahim moving with the crowd, inside the separated barricades near the steps of the Senate.   That video shows Ibrahim on the inside of breached barricades, past a high security wedge barrier with red letters spelling "STOP," past an overturned barrier, as well as police vehicle with its flashing lights illuminated. Figure 17.   At 2:03 p.m., defendant Ibrahim is photographed on the inside of the barricades flashing his badge and DEA issued firearm.   Figure 18.

   

Figure 17                    Figure 18

At 2:10 p.m., a person posted a video to Parler which shows Ibrahim in the same area and also shows some of the chaos around him when he flashed his badge and service weapon.   Contrary to his assertion that he was taking private photographs and facing away from the crowd, video

footage taken by defendant Ibrahim shows the substantial crowd facing him from the direction in which he flashed his badge and DEA service weapon.   *See* Figure 19.



Figure 19

At approximately 2:10 p.m., Ibrahim took a video of himself, which he subsequently posted to the WhatsApp group chat, standing in the crowd on a patch of grass above the United States Capitol visitor's center between the East Portico of the Capitol and the Senate.   This location is approximately 180 feet inside the east barricades that had recently been overrun. Near the end of the video, the camera pans around to rest on Ibrahim's face.



Figure 20

9

At approximately 2:30 p.m., one of the other law enforcement officers participating in the WhatsApp group chat with Ibrahim re-posted the earlier text stating "Question Mark, you are carrying your duty weapon and your badge/creds? I need to know this mark."



Figure 21

At approximately 2:45 p.m., Ashli Babbitt was shot by a law enforcement officer while she was attempting to enter a location within the U.S. Capitol Building. She was taken from the Capitol Building by fire and EMS at 3:00 p.m., she was transported within steps of Ibrahim and loaded into an ambulance at 3:01 p.m.    Ibrahim's friend, who was standing next to Ibrahim, videotaped her as she was being moved past them. Ibrahim subsequently posted that video to the WhatsApp group chat.

Shortly after 3:00 p.m., Ibrahim, his friend, and his brother continued their clockwise circuit around the Capitol Grounds and arrived at the Peace Monument in the Peace Circle at First Street, NW, and Pennsylvania Avenue NW, which is located on the Capitol Grounds.

At approximately 3:24 p.m., Ibrahim's friend took a photograph of the Peace Monument from outside of the barricades.    The Area Closed sign is visible directly in front of the Peace Monument.

 

Figure 22                    Figure 23

Moments later, Ibrahim climbed up onto the Peace Monument.    While on the Peace Monument,

Ibrahim took a video of himself delivering a monologue, and ended the video showing the scene

from on the Peace Monument. In a frame from this video, the bicycle racks surrounding the

Peace Monument can be seen as well as the back of the Area Closed Sign.[1]

---

[1] The video shows the Area Closed signs on the outside of the Peace Circle.



Figure 24

At approximately 3:29 p.m., after climbing down from the Peace Monument, Ibrahim

again posed for several photographs while displaying his DEA badge and firearm.



Figure 25

Ibrahim also created a YouTube channel called the Liberty Tavern Channel.    Ibrahim posted a video of that day to his channel.    In a series of three video shorts, Ibrahim can be heard discussing Liberty Tavern cigars just feet from the Capitol.



Figure 26

Ibrahim can be heard saying "just chilling, enjoying a Liberty Tavern Cigar. On the steps of the Capitol. Mazel tov."   *See* https://www.youtube.com/watch?v=rKNnQrUnSgE.

13



Figure 27

In another episode, he says "Fuck it, let's do it live. Let's go check it out."    See

https://www.youtube.com/watch?v=MhEcmIE0roo.



Figure 28

In another episode, he says "Just here at the steps of the Capitol enjoying a nice Liberty Tavern

cigar and yeah, apparently some guys got in." See

https://www.youtube.com/watch?v=mxN8mXBBuxI.

1.     **Defendant's statement of facts – disputed by the government**

Sprinkled throughout his background and memorandum of points and authorities, defendant Ibrahim makes various factual claims.    Those factual assertions play no role in resolving the defendant's pretrial claims.   *See United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.) (internal quotation omitted) ("Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense."). Moreover, many of those factual claims are inaccurate.    Some—though not all—of those inaccuracies are described below.

Defendant Ibrahim claims that he "was ready to defend the United States Capitol and offered to do so to the FBI."    ECF No. 21, pg. 8.    The contemporaneous record does not back this assertion made in his motion to dismiss.    Rather, the contemporaneous WhatsApp conversations with his DEA colleagues mention nothing about assisting in any law-enforcement capacity.    Further, his contemporaneous Liberty Tavern cigar monologues belie any attempt to assist in any law-enforcement capacity.

Defendant Ibrahim claims that he carried his gun and badge on his person because he was encouraged to do so at all times by his employer, whether on or off duty.    ECF No. 21, pg. 9. Ibrahim offers no support or corroboration for this statement.    In fact, defendant Ibrahim's statement is contrary to established and promulgated DEA policy.    The DEA Agents Manual provides, in part, that the "procedures, guidelines and other provisions of the Drug Enforcement Administration (DEA) Agents Manual are not intended to, do not, and may not be relied upon to

15

create any rights, substantive or procedural, enforceable at law by any party in any matter, civil

or criminal."   Further, and more specifically, the DEA Manual has a policy concerning carrying

firearms, both on duty and off duty.   Even while on duty, DEA agents are not encouraged, or

even permitted, to carry firearms "at all times." The DEA Agents Manual provides that while on

official duty status "SAs must carry their handgun on their person, secured in a holster, fully

loaded, with a round in the chamber (for semi-automatic handguns) and with an adequate supply

of at least one reload of ammunition except . . . 4. Subject to another agency's bona fide security

requirements."   Consequently, even while on duty, DEA SAs are subject to other agency's

security requirements, in this case the United States Capitol's ban on firearms on Capitol

Grounds.   The off-duty provisions are even less supportive of defendant Ibrahim's position,

providing merely that "SAs are authorized to carry their firearm while available for duty or while

in an approved leave status."[2]

   Defendant Ibrahim claims that "Mr. Calzadilla took several private photographs of Mr.

Ibrahim, in which Mr. Ibrahim's back was to the crowd at the rally." ECF No. 21, pg. 9.   Mr.

Calzadilla is defendant Ibrahim's friend who accompanied him and who took photographs.   As

---

[2] 40 U.S.C. § 5104(e)(1)(A) (Firearms and Dangerous Weapons on Capitol Grounds) states as a qualifier to the prohibition "except as authorized by regulations prescribed by the Capitol Police Board." The promulgated Police Board Regulations Pertaining to Firearms and Other Dangerous Weapons provides "the provisions of section 6(a)(1)(A) of the Act, as amended relating to the carriage of firearms shall not apply to officers or employees of the United States authorized by law to carry firearms, duly appointed federal, state of local law enforcement officers authorized to carry firearms, and members of the Armed Forces, while engaged in the performance of their duties, or any person holding a valid permit under the laws of the District of Columbia to carry firearms in the course of his employment."   As stated, defendant Ibrahim concedes that "he was not on official duty that day." ECF No. 21, pg. 8.

the above-identified photographs show, Ibrahim was surrounded by people at the Capitol.   See

Figure 19.   Consequently, it was not possible to take "private" photographs.

Defendant Ibrahim claims that "Amidst the chaos of the riot, Mr. Ibrahim sought and

found refuge on a statute, out of necessity, so that he could clearly see what was happening, and

to gather his bearings and provide security for himself and others. At approximately 3:29 p.m.,

Mr. Ibrahim stepped down from the safety of his perch and Mr. Calzadilla took multiple photos

of Mr. Ibrahim. In each of these photographs, Mr. Ibrahim had his back to the crowd, and his

DEA badge and firearm are slightly visible. The photograph was intended to be private . . ." ECF

No. 21, pg. 10.   Defendant Ibrahim fails to mention that he was at the Peace Monument at least

twice, once before walking around the Capitol and after walking around the Capitol.   If

anything, the scene was more chaotic when defendant Ibrahim initially posed in front of the

Peace Monument at approximately 1:22 p.m.:



Figure 29

Subsequently, at 3:25 p.m., the Peace Monument looked as follows in Figure 31.   Two minutes

later, Ibrahim climbed on the Peace Monument.   Undisclosed by Ibrahim is that he also took

video footage of his climbing on the Peace Monument.    He pans out and captures on his own

video his friend getting ready to photograph as well as his FBI brother, standing outside the

posted barricade.

      

Figure 30                  Figure 31                  Figure 32

Ibrahim also delivers a monologue.    Far from discussing his bearings or security, Ibrahim states

I think the statue is actually it's iconic this woman is crying, covering her face.    It's a shame.

It's a shame.    He then turns his camera on himself.



Figure 33

Two minutes later he climbs down from the Peace Monument and poses with a man with a

pitchfork for a photograph:



Figure 34

## ARGUMENT

### I.       The Motion to Dismiss the Indictment

Defendant Ibrahim moves to dismiss the indictment in its entirety based upon Federal Rules of Criminal Procedure Rules 12(b)(3)(A)(iv) and 12(b)(3)(B)(iii), and Rule 7(c)(1) of the Federal Rules of Criminal Procedure.

Before trial, a defendant in a criminal case may, pre-trial, move to dismiss an indictment for selective or vindictive prosecution. Fed. R. Crim. P. 12(A)(iv).   A defendant may also challenge a defect in the indictment, such as lack of specificity. Fed. R. Crim. P. 12(B)(iii).

A valid indictment must set out "the elements of the offense intended to be charged and sufficiently apprise defendant of what he must be prepared to meet." *United States v. Pickett*, 353 F.3d 62, 67 (D.C. Cir. 2004). The Government must state the essential elements of the crime and allegations "with sufficient specificity." *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995), *see also United States v. Griffin*, Case No. 21-cr-00092 (TNM) (D.D.C., Jul. 2. 2021).

A pretrial motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." *Id*.   "An indictment must be viewed as a whole and the allegations must be accepted as

19

true in determining if an offense has been properly alleged." *United States v. Bowdin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).   The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.*   Although a court's supervisory powers provide the authority to dismiss an indictment, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that defendant is alleged to have violated."

### A.     Any purported selective prosecution claim fails as a matter of law

Because "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties."   *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks and citations omitted).   This presumption "rests in part on an assessment of the relative competence of prosecutors and courts."   *Id.* at 465.   "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."   *Id.* (citation omitted); *see also United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) ("[J]udicial authority is . . . at its most limited when reviewing the Executive's charging determinations" because "the Judiciary . . .

generally is not competent to undertake that sort of inquiry.") (internal quotation marks and citations omitted).

To overcome that presumption, a defendant must present "clear evidence" that a decision to prosecute was "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'"   *Armstrong*, 517 U.S. at 464-465.   "The claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'"   *Id*. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Concerned that selective-prosecution inquiries "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy," the Supreme Court has also imposed a "correspondingly rigorous standard for discovery in aid of such a claim."   *Armstrong*, 517 U.S. at 468.   The defendant must initially produce "some evidence tending to show the existence of the essential elements of" selective prosecution: "discriminatory effect and discriminatory intent." *Ibid*. (citation omitted).   The defendant's evidence must also be "credible"—something more than "personal conclusions based on anecdotal evidence."   *Id*. at 470.   "If either part of the test is failed," the defendant cannot "subject[] the Government to discovery."   *Att'y Gen. of United States v. Irish People, Inc*., 684 F.2d 928, 947 (D.C. Cir. 1982).

## I.   Discussion

Ibrahim's allegations rest on two allegations: (1) the government charged him more severely than other similarly situated January 6 defendants; and (2) this disparity "was based on politically motivated" reasons.   ECF No. 21, pg. 13. Ibrahim's motion, however, fails to adduce any credible evidence—as *Armstrong* demands—supporting either assertion.   Furthermore, Ibrahim fails to identify ***what*** "politically motivated" reason the government purportedly relied

upon to charge him, but did not charge others.[3]

In *United States v. Couy Griffin*, No. 21-cr-00092 (TNM), the defendant raised a selective prosecution claim. He claimed that he was targeted and "selectively charged . . . because the government loathed him and his politics." Order, *Griffin*, No. 21-cr-00092 (TNM) (Jul. 2, 2021) ECF No. 41, pg. 12.    In rejecting the selective prosecution claim, the Court held "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *Citing United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016).    Further:

> Griffin comes up short on providing the "clear evidence" required for this Court to surmount the presumption of regularity—and the separation of powers. He points to "hundreds or perhaps thousands of other individuals 'remaining' in the same area" as him on January 6 who have not faced charges under 18 U.S.C. § 1752. Def.'s Mot. at 24. The Court hesitates to credit these unsupported numbers, especially as the Government continues to charge new individuals with offenses related to January 6. Nor is the Court concerned by the Government's statements about Griffin when seeking to detain him pretrial; detention hearings require the Court to consider the defendant's history and personal characteristics, as well as his potential dangerousness.

> *                    *                    *

> . . . Even so, the Government could rationally forgo federal prosecution as to most trespassers while deciding that Griffin's leadership role in the crowd, position as an elected official, and more blatant conduct at the scene merited him different treatment. Not all differences amount to discrimination. In any event, presumably Kelly and the other uncharged protestors surrounding Griffin on the Capitol steps share his "politics," Def.'s Reply at 3, complicating his complaint of bias here.

*Griffin*, No. 21-cr-00092 (TNM) (Jul. 2, 2021) ECF No. 41, pgs. 13-14.

---

[3] Ibrahim also fails to mention the cases *United States v. Mark Mazza*, No. 1:21-cr-00736-JEB-1 and *United States v. Christopher Alberts*, No. 21-CR-026 (CRC), both of which involve alleged violations of 40 U.S.C. § 5104(e)(1)(A).

Defendant Ibrahim's proffer of two cases comes up far short of the "clear evidence" that a decision to prosecute him was based on "an unjustifiable standard such as race, religion, or other arbitrary classification."   One such "case," his brother, involves an FBI SA who is his family member, and which the evidence shows did not misuse his position by posing multiple times with his official badge and firearm displayed in the middle of a riot, who did not climb on a monument, who can also be seen standing of the correct side of the barricade (Figure 32), and who was also candid with law-enforcement when questioned about his own conduct, and that of defendant Ibrahim.   The other example includes a Customs and Border Patrol Officer who also did not flash his badge and firearm, and who was not even on Capitol Grounds.   Further, the Customs and Border Patrol officer was observed in the vicinity of the Capitol nine months after the events of January 6, 2021.[4]   Defendant Ibrahim's selective prosecution claim fails at the first step.

**B.      The vindictive prosecution claim fails as a matter of law**

As previously noted, because "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks and citations omitted). This presumption "rests in part on an assessment of the relative competence of prosecutors and courts." *Id*. at 465.   The government cannot, however, engage in vindictive prosecution. "'Prosecutorial vindictiveness' … refers to a situation in which the government acts against a defendant in response to the defendant's prior

---

[4] The Justice for J6 rally was also not a riot.   *See*, in contrast, ECF No. 21, pg. 10 ("Amidst the chaos of the riot").

exercise of constitutional or statutory rights." *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987) (*citing United States v. Goodwin*, 457 U.S. 368, 372 (1982)).

A defendant may prove prosecutorial vindictiveness one of two ways: submitting (1) evidence of the prosecutor's actual vindictiveness or (2) evidence sufficient to establish a realistic likelihood of vindictiveness, thereby raising a presumption the Government must rebut with objective evidence justifying its action. *United States v. Meadows*, 867 F.3d 1305, 1311 (D.C. Cir. 2017) (*quoting United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011)). "If the Government can produce objective evidence that its motive in prosecuting the defendant was not vindictive, then the defendant's only hope is to prove that the justification is pretextual and that actual vindictiveness has occurred." *Id*.

"To prove actual vindictiveness requires objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights. Such a showing is normally exceedingly difficult to make." *Id*. (*citing United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002)).   "To invoke the presumption of vindictiveness, [the Court] must find that a reasonable likelihood of vindictiveness exists—that is, that the [charges were] 'more likely than not attributable to the vindictiveness on the part of' the [g]overnment." *Id* (*quoting Gary*, 291 F.3d at 34).   Ultimately, to succeed on a claim of vindictive prosecution, a defendant must establish that the charge was "brought solely to 'penalize' him and could not be justified as a proper exercise of prosecutorial discretion." *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 175 (D.D.C. 2020) (*citing United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017)).

Defendant Ibrahim does not cite one case in which a court dismissed the government's initial charging decision based on vindictive prosecution. That is for good reason: neither the

24

Supreme Court nor the D.C. Circuit has ever held that the government's initial charging decision amounted to prosecutorial vindictiveness. Normally, such claims follow a superseding charging document that adds charges to a preexisting criminal case after a defendant exercises a constitutional or statutory right.   *See, e.g., Slatten*, 865 F.3d at 799.   Instead, the defendant's argument is effectively a First Amendment affirmative defense couched in vindictive prosecution terms.   Regardless, his arguments miss the mark.

Ibrahim's claim of "prosecutorial animus" rests on his assertion that "Mr. Ibrahim was not Indicted until he was interviewed by Tucker Carlson, a well-known Republican news outlet." ECF No. 21, pg. 19.   Further, Ibrahim claims that "Defendant Ibrahim supported President Donald J. Trump.   He was targeted for that belief."   Further still, "On information and belief, the Government knew that Defendant Ibrahim had filed a grievance for his wrongful termination from the DEA . . . and this vindictiveness manifested through a retaliatory Indictment be [sic] filed."   ECF No. 21, pg. 19.

This Court has previously considered, and denied, a vindictive prosecution claim in the context of the Capitol breach.   *See United States v. Shroyer*, 1:21-cr-00542-TJK (Minute Order, Jan. 20, 2022).   In *Shroyer*, the defendant claimed that the government's prosecution of him was "vindictive and retaliatory" because he engaged in First Amendment speech.   *See* Motion to Dismiss, *United States v. Shroyer*, CR No. 1:21-cr-00542-TJK-1 (ECF No. 8, pg. 19). Specifically, the defendant argued that "that Shroyer's speech – critical of the United States government and how it conducted the 2020 presidential election – is the United States' primary motivation for prosecuting him."   *Id*. In rejecting that claim, this Court concluded:

> The defendant argues that he holds political views the Government dislikes and that the case was brought in response to the defendant exercising his constitutionally protected

First Amendment rights.

So to establish vindictive prosecution, the defendant must submit either, one, evidence of the prosecutor's actual vindictiveness; or, two, evidence sufficient to establish a realistic likelihood of vindictiveness. That's the D.C. Circuit in *United States v. Safavian*, 649 F.3d at -- 688 at 693. This is an exacting standard. To succeed on a claim of vindictive prosecution, the defendant must show that the Government brought the charge, quote, Solely to penalize him and could not be justified as a proper exercise of prosecutorial discretion, closed quote.   *United States v. Slatten*, 865 F.3d 767 at 799, a cleaned-up quote from that case, a D.C. Circuit case from 2017.

The defendant does not meet this high bar. He has little, if any, evidence here suggesting vindictiveness.   As I suggested earlier, he has not shown that any material that would have materially affected the magistrate's decision was omitted. And that itself undermines a claim that the charges here were brought solely because the defendant exercised his First Amendment rights. The Supreme Court has made clear in a related context that a party pressing a retaliatory arrest claim must prove the absence of probable cause for the arrest. That's *Nieves v. Bartlett*, 139 Supreme Court 1715 at 1725, a Supreme Court case from 2019.   And the defendant has certainly not done that.

Nor do the four crimes that the defendant is charged with turn on the content of the defendant's potentially expressive actions, which may or may not be covered by the First Amendment. In criminal proceedings, the Government can point to protective -- protected speech in order to establish elements of a crime. For example, that the defendant interrupted governmental proceedings. *See Wisconsin v. Mitchell*, 508 United States 476 at 489, a -- Supreme Court from 1993. For this reason, I don't need to determine if the defendant engaged in constitutionally protected speech on January 6th to resolve this motion. Even if he did, the Government is still allowed to use what he said to establish the elements of a crime. And doing so here is not evidence of a vindictive prosecution.

Transcript of hearing, *United States v. Shroyer*, CR No. 1:21-cr-00542-TJK-1 (Jan. 20, 2022) pg.

14-15.

Defendant Ibrahim's claims suffer from the same legal deficiencies as those in *Shroyer*.

Although Ibrahim claims that he is not guilty of the crimes charged, or not properly prosecuted

for the reasons stated in his motion, he does not argue that the government lacked probable

cause.   Further, the four offenses with which the defendant is charged do not turn on the content

of his claimed political views.   Rather, they are two firearm possession offenses, a property

26

offense, and a false statement offense.

In any event, the defendant's conduct was not "expressive," and thus his claim that his First Amendment rights were abridged fails on its face. It is uncontroverted that once the defendant entered the Capitol grounds with a firearm it was his presence and possession, not any "expressive conduct" (or speech) that was unlawful. The First Amendment does not protect the defendant from any of the charges he faces in this case just because he also possessed a flag and climbed on the Peace Statue.    Possessing a flag is not the conduct that the statute criminalizes. To the contrary, it is the defendant's *actus reus* (presence and possession of a firearm) coupled with his *mens rea* (knowingly possessing a firearm on Capitol Grounds) that violates the various statutes at issue.

### C.    Ibrahim has not met the threshold for discovery for a selective prosecution claim

Defendant Ibrahim's motion fails the threshold evidentiary showing for discovery on a selective-prosecution or enforcement claim.    His request should be denied.

#### 1.    Legal Framework

Because "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks and citations omitted). This presumption "rests in part on an assessment of the relative competence of prosecutors and courts." Id. at 465. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and

the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id*. (citation omitted); *see also United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) ("[J]udicial authority is . . . at its most limited when reviewing the Executive's charging determinations" because "the Judiciary . . . generally is not competent to undertake that sort of inquiry.") (internal quotation marks and citations omitted).

To overcome that presumption, a defendant must present "clear evidence" that a decision to prosecute was "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 464-465 (citation omitted).   "The claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id*. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Concerned that selective-prosecution inquiries "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy," the Supreme Court has also imposed a "correspondingly rigorous standard for discovery in aid of such a claim." *Armstrong*, 517 U.S. at 468. The defendant must initially produce "some evidence tending to show the existence of the essential elements of" selective prosecution: "discriminatory effect and discriminatory intent." *Ibid.* (citation omitted).   The defendant's evidence must also be "credible"—something more than "personal conclusions based on anecdotal evidence." *Id*. at 470.   "If either part of the test is failed," the defendant cannot "subject[] the Government to discovery." *Att'y Gen. of United States v. Irish People, Inc.*, 684 F.2d 928, 947 (D.C. Cir. 1982).

### 2.    Discussion

28

Defendant Ibrahim's motion for discovery rests on his claim that "As mentioned above, Mr. Ibrahim has shown clear evidence of both this prosecution's discriminatory effect and discriminatory intent."   ECF No. 21, pg. 21.   Incorporating his earlier arguments, the motion suggests that he relies upon the claim that (1) "a United States Customs and Border Protection officer was never prosecuted by the Government for his involvement in the events of January 6, 2021, despite carrying a firearm during the "Justice for J6" rally at the Capitol" and (2) "Mr. Ibrahim's brother attended the rally on January 6, 2021 as an off-duty FBI agent, and like Mr. Ibrahim, carried his badge and gun on his person."   ECF No. 21, pgs. 14-15.

But Ibrahim's motion fails to adduce any credible evidence—as *Armstrong* demands— supporting either that his charges arise from a discriminatory effect or that it was motivated by a discriminatory purpose.   Apparently substituting evidence for argument that a decision to prosecute was "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification," Ibrahim claims that another federal agent similarly situated was NOT charged and that his similarly situated FBI brother was also NOT charged.   Obviously missing from his claim or proffer, is the suggestion or claim that any unjustifiable standard was used, as if a distinction between the FBI and DEA gives rise to a protected class.

In addition, his argument is factually flawed.   The article appears to reference an arrest of a Customs and Border Patrol agent that took place on September 18, 2021, not January 6, 2021.   *See* https://apnews.com/article/arrests-riots-capitol-siege-gun-politics-us-customs-and-border-protection-f35fb9ad54ac0babf710e87eaec8a4b1, last accessed January 31, 2022.   Furthermore that agent does not appear to have been on restricted grounds.   Additionally, the purpose of that event was purportedly to express sympathy with the "hundreds of people who

29

were arrested and charged following the 2021 United States Capitol attack." *See*

https://en.wikipedia.org/wiki/Justice_for_J6_rally, last accessed on January 31, 2021.   Not only

does this present a factually different scenario from Ibrahim's case such that Ibrahim cannot

satisfy the similarly-situated showing, the likelihood that the agent shares view similar to those

held by Ibrahim in this pleading suggest that Ibrahim cannot satisfy the discriminatory-intent

showing.

      Defendant Ibrahim also requests sweeping information concerning the scope of all law-

enforcement officers who may have been present at the Capitol on January 6, 2021.   In his

motion, Ibrahim states:

> On information and belief, Mr. Ibrahim, his brother Michael Ibrahim, Agent Levi
> Thomas, the FBI WFO SWAT Team and Jorge Calzadilla, an FBI Informant, were not
> the only Federal Agents and sources of information at the rally. The Defense intends to
> ascertain who was assigned to attend, by whom, when, and why. The Defense plans to
> find out whether they were in plain clothes, badged and armed and whether they
> were given specific orders. The Defense intends to understand what the DOJ investigation,
> one of the largest ever in the history of the United States, has revealed in terms of how
> many agents attended even if they were not specifically ordered to attend and whether
> any agents have provided information to DOJ resulting from their presence at the rally.

ECF No. 21, pg. 16.   Ibrahim fails to make any threshold showing under *Armstrong* that would

justify such an inquiry.   This supposed inquiry is also a *non sequitur* and makes no sense: If

Federal Agents were present, similarly situated, and, presumably, shared his views, the purported

discovery would **disprove** his claim here.   *See* Order Denying Selective Prosecution Claim,

*United States v. Griffin*, No. 1:21-cr-00092-TNM, (Jul. 2, 2021) ECF No. 41, pg. 13-14 ("Not all

differences amount to discrimination. In any event, presumably Kelly and the other uncharged

protestors surrounding Griffin on the Capitol steps share his "politics," Def.'s Reply at 3,

complicating his complaint of bias here").

**D.      Ibrahim's evidentiary challenge to his false statement charge under 18 U.S.C. § 1001(a)(2) is premature and unsupported**

Defendant Ibrahim's motion to dismiss Count four (False Statement) is premature. Defendant seeks to challenge the sufficiency of the evidence pre-trial.   An indictment "do[es] not have to set forth evidence or details of how a crime was committed." *United States v. Triumph Capital Grp., Inc.,* 260 F. Supp. 2d 444, 448 (D. Conn. 2002) (*citing United States v. Carrier*, 672 F.2d 300, 303-04 (2nd Cir. 1982)).   Because an indictment is "tested by its allegations, not by whether the government can prove its case," it is "not subject to dismissal on the basis of factual questions, the resolution of which must await trial." *Id*. (*quoting United States v. Alfonso*, 143 F.3d 772, 776-7 (2d Cir. 1998)) (citation omitted), *see also United States v. Kelly*, 462 F. Supp. 3d 191 (W.D. N.Y. 2020).   Moreover, there is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context. *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005), *see also United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000); *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995).   Instead, Rule 12(b) of the Federal Rules of Criminal Procedure provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."   The "general issue" has been defined as "evidence relevant to the question of guilt or innocence." *Yakou*, 428 F.3d at 246, *quoting United States v. Ayarza-Garcia*, 819 F.2d 1043, 1048 (11th Cir. 1987) (*citing United States v. Barletta*, 644 F.2d 50, 58 (1st Cir. 1981)).

Moreover, in ruling on a pretrial motion to dismiss the trial court must presume the truth of the facts alleged in the charging instrument, *United States v. Park*, 938 F.3d 354, 358, 443 401

(D.C. Cir. 2019), and may accept any "undisputed facts" proffered by the government, *Yakou*, 428 F.3d at 247(explaining that "undisputed facts obviate . . .   the need for [a] district court to make factual determinations properly reserved for a jury"); *see also United States v. Barnes*, 481 F. Supp. 3d 15 (D.D.C. 2020).

Defendant Ibrahim objects to the sufficiency of the evidence supporting the False Statement claim in Count Four.   Defendant states "the Government has wrongfully indicted Mr. Ibrahim because the Government failed to present any evidence showing 1) Mr. Ibrahim had the requisite intent to knowingly and willingly make a false statement and 2) that Mr. Ibrahim's statement was material." ECF No. 21, pg. 21.   Defendant Ibrahim cannot use Federal Rule of Criminal Procedure 12 to adjudicate the sufficiency of the evidence pre-trial.   *See Yakou*, 428 F.3d at.   Instead, the proper time to raise such an argument would be at the close of evidence at trial. *See* Fed. R. Crim. Proc. 29(a).

**E.    Ibrahim's necessity defense is premature and not supported**

In much the same way that defendant Ibrahim's motion to dismiss the indictment based upon the sufficiency of the evidence is premature, so too is dismissal based on his purported necessity affirmative defense.

Moreover, Defendant Ibrahim is likely precluded from raising the defense of necessity as a matter of law.   *See United States v. Ridner*, 512 F.3d 846, 849 (6th Cir. 2008) (a defendant must make a *prima facie* showing to raise the defense).   The District Court for the District of Columbia outlined the defense of necessity:

> The case . . . must be one of absolute and uncontrollable necessity; and this must be established beyond reasonable doubt. . . . Any rule less stringent than this would open the

door to all sorts of fraud. Attempted evasions of the [statute in question] would be
excused upon pretenses of distress and danger, not warranted by the facts, but the falsity
of which it would be difficult to expose.

*United States v. North*, No. 88-0080-02-GAG, 1989 U.S. Dist. LEXIS 4799 (D.D.C., Apr. 4,

1989) (citing *United States v. The Diana*, 74 U.S. (7 Wall.) 354, 360 (1869)).    Because the

necessity defense may raise important legal and policy issues concerning the wisdom and value

of legislative enactments, courts commonly find that the defense is unavailable and may not be

submitted to a jury.    Thus, the Supreme Court has held that a prison escapee "is not entitled to

claim a defense of duress or necessity unless and until he demonstrates that, given the imminence

of the threat, violation [of the statute] was his only reasonable alternative."    *United States v.*

*Bailey*, 444 U.S. 394, 410-11 (1980); *see also United States v. Frankel*, 739 F. Supp. 629, 632

(D.D.C. 1990) ("The defendant can cite this Court to no caselaw in which courts have allowed

the necessity defense as it relates to political actions").

Defendant Ibrahim's claimed necessity defense cannot be decided in his favor pre-trial.[5]

His claim is not factually or legally supported.    As the aforementioned photographs of

defendant Ibrahim demonstrate, there were more people gathered around the Peace Monument

when he first entered the Capitol Grounds around 1:30.    Furthermore, his proffered

"responsibility to survey the scene and determine the severity of the situation, while keeping

himself out of a dangerous situation involving tear gas, flash-bangs, and a rapidly growing

crowd" does not created a necessity justifying his conduct.    He could have, and should have,

---

[5] The defendant's proffered affirmative defenses may, however, be precluded as a matter of law
and may be the appropriate subject of a motion in *limine*.   *See North*, No. 88-0080-02-GAG,
1989 U.S. Dist. LEXIS 4799 (D.D.C., Apr. 4, 1989) (court declines to give jury instructions
concerning affirmative defenses).

simply left.    Even if he re-raises his necessity claim as a pretrial *limine* motion, this Court should deny it.

**F.      Any purported First Amendment Defense Fails as a Matter of Law**

In *Texas v. Johnson*, 491 U.S. 397, 403, (1989), the Supreme Court explained the procedure for determining whether a defendant may invoke the First Amendment to challenge a criminal charge. First, the court must determine whether defendant's conduct "constituted expressive conduct." *Id*. If the conduct was not expressive, the challenge fails. *Id*. Second, if the conduct was expressive, the court must determine if the statute is "related to the suppression of free expression." *Id*. If the statute is not related to the suppression of free expression, the court applies the "less stringent standard" for noncommunicative conduct laid out in *United States v. O'Brien*, 391 U.S. 367, 377 (1968). *Johnson*, 491 U.S. at 403. If the statute is related to the suppression of free expression the court must apply a "more demanding standard" to determine if the government's interest justifies imposition of criminal liability. *Id*.

Under *O'Brien*, the statute is constitutional only if (1) "it is within the constitutional power of the government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377.

Defendant's conduct was not "expressive," and thus his challenge fails before reaching the *O'Brien* factors.    Whatever he was doing walking to the Capitol, it is uncontroverted that once he entered the Capitol, and Restricted Grounds armed with a deadly weapon it was his presence, and possession of a firearm, not his "expressive conduct" (or speech) that was unlawful.    When

he climbed up on the Peace Monument, it was his act of climbing on a National Monument, not any reason for doing so, that was unlawful.

But even if the *O'Brien* factors apply, defendant's argument still fails.   Here, the government interest in protecting the integrity and continuity of congressional proceedings, and the Vice President of the United States and Members of Congress, is unrelated to any incidental impact that the application of the law may have on the ability to petition government for a redress of grievances.   The government interest in protecting the physical integrity of National Monuments is unrelated to any incidental impact that the application of the law may have on the ability to express oneself in a First Amendment appropriate fashion.   Second, the statutes go no further than what is "essential" to protect Members of Congress and the Vice President.   The Supreme Court has upheld restrictions on demonstrations in Washington, D.C. with far less at stake then the lives and safety of elected officials and the physical integrity of National Monuments. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (upholding a ban on overnight camping on the National Mall and finding a "substantial Government interest in conserving park property, an interest that is plainly served by, and requires for its implementation, measures such as the proscription of sleeping that are designed to limit the wear and tear on park properties").

**G.     Ibrahim's entrapment defense is premature and not supported**

Defendant Ibrahim's entrapment defense is premature and, in any event, unsupported.   It is certainly not subject to a pre-trial motion to dismiss.   "To establish entrapment as a matter of law, the defendant must point to undisputed evidence making it patently clear that an otherwise

innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a government agent." *United States v. Williams*, 547 F.3d 1187, 1197 (9th Cir. 2008) (quoting *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir. 1986)). Although the defendant asserts various facts in a motion — many of these facts are disputed by the government.    Disputed facts cannot provide a basis for dismissing charges pre-trial. *See United States v. Freed*, 401 U.S. 601, 607, 91 S. Ct. 1112, 28 L. Ed. 2d 356 (1971) (refusing to consider an entrapment defense in a motion to dismiss because entrapment "is an issue for the trial, not for a motion to dismiss"); *United States v. Fadel*, 844 F.2d 1425, 1430 (10th Cir. 1988) (explaining that pretrial resolution of the entrapment defense is not favored because "the defense of entrapment is intertwined with the issue of intent and is typically based upon credibility determinations, an area traditionally reserved for jury resolution").    Defendant Ibrahim may request an entrapment instruction at trial if warranted by the evidence.   *See United States v. Bunnell*, No. CR-14-00119-001-PHX-DGC, 2014 U.S. Dist. LEXIS 163263, 2014 WL 6611545 (Nov. 21, 2014).

Defendant's entrapment defense is also factually and legally unfounded.    In his interview with law-enforcement on March 15, 2021, defendant Ibrahim never suggested or stated in any way that he was enticed to possess or expose his firearm by any federal agent, nor does he claim that he was induced to climb on the Peace Monument or lie to a federal officer by any federal agent.   Defendant Ibrahim has also made public statements in which he has indicated that he was not entrapped.   *See* YouTube, https://www.youtube.com/watch?v=K5CPUpGOAo0&t=326s, Tucker Carlson Interviews DEA Agent Mark Ibrahim, July 22, 2021, last accessed February 1, 2022.

WHEREFORE, the government respectfully requests that this Court deny Defendant's motion to dismiss.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:       <u>       /s/          </u>
        James D. Peterson
        Trial Attorney
        United States Department of Justice
        Special Assistant United States Attorney – D.C.
        VA Bar 35373
        1331 F Street N.W.
        6th Floor
        Washington, D.C. 20530
        (202) 353-0796
        James.d.peterson@usdoj.gov