# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| | ) |
| **V.** | ) CASE NO: 1:21-CR-496 |
| | ) |
| **MARK IBRAHIM,** | ) HEARING: JUNE 30, 2022 |
| | ) |
| DEFENDANT. | ) **REDACTED** |
| | ) |

### MEMORANDUM IN SUPPORT OF MOTION FOR DISCOVERY ON EQUAL PROTECTION GROUNDS FOR SELECTIVE PROSECUTION

Pursuant to the Federal Rule of Criminal Procedure 12(b)(3)(A)(iv) and the Fifth Amendment to the United States Constitution, the defense moves for discovery on the government's selective prosecution of the defendant following his participation in the January 6 protest in front of the Capitol.

On January 6, 2021, Mark Ibrahim, an armed, off-duty federal law enforcement officer, attended the political protest in front of the Capitol. Although he never went inside the Capitol building, and although he defended law enforcement officers from protesters, he was charged with trespass-style offenses with penalty enhancement for being armed, *despite his department encouraging off-duty carry and requiring ready access to his firearm*. At the same time, other, armed, off-duty federal law enforcement officers who attended the protest, including Mark Ibrahim's brother, who attended along with Mr. Ibrahim, were not charged. Defense review of the differences between these individuals yielded one differentiating variable— outward political expression. Mr. Ibrahim carried flags associated with the conservative movement, he stated that

part of the reason he attended was to support President Trump, and he publicly lamented the shooting death of unarmed conservative protester Ashli Babbitt. These political expressions were investigated by the government in-depth even though none of these conservative beliefs were elements of any criminal offenses. At one point, the investigating agent specifically asked Mr. Ibrahim's coworkers whether he expressed his conservative beliefs at the same time as asking whether he was an "extremist," as if the two are equally concerning. And, the investigating agent made it a point to advise the grand jury that Mr. Ibrahim held himself out as a conservative.

Mr. Ibrahim presents substantive and reliable evidence to support his request for discovery on the grounds of politically motivated selectiveness — relying on the words of the investigating government agent that reveal political prejudice in selecting Mr. Ibrahim for prosecution, an armed off-duty federal police officer who never entered the Capitol building but who engaged in outward political expression, while simultaneously foregoing the prosecution of identically situated armed and off-duty officers who *did not* engage in outward political expression.

## I. Legal Standard

Selective prosecution claims are judged "according to ordinary equal protection standards." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). In Footnote 9 of *Wayte*, the Supreme Court explained that although the Fifth Amendment does not contain an equal protection clause, "it does contain an equal protection component." *Wayte,* 470 U.S. 598, n. 9; *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The Supreme Court's treatment of Fifth Amendment equal protection claims has been "precisely the

same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n. 2 (1975).

A selective prosecution claim begins through a defendant's assertion that the government has brought a criminal charge against a particular defendant for reasons forbidden by the Constitution and a corresponding demand for discovery on the matter. *United States v. Armstrong*, 517 U.S. 456 (1996). The defendant's initial assertion of selective prosecution does not require conclusive proof; rather, the assertion simply entitles the defendant to discovery in aid of his claim — if he reaches the "rigorous" standard that is outlined in *Armstrong —* "a credible showing of different treatment of similarly situated persons." 517 U.S. at 468-70. To meet his burden, the defendant must demonstrate that the government's prosecutorial decisions had a discriminatory effect *and* were motivated by a discriminatory purpose. *Id*. But the defendant does not need to prove this by a preponderance of the evidence, nor by clear and convicting evidence. Instead, for purposes of supporting his discovery request, the defendant need only show "some evidence tending to show the existence of the essential elements" of a selective prosecution claim. *Armstrong,* 517 U.S. 469-70.

Generally, the government benefits from a "presumption of regularity" in deciding when and whether to institute criminal proceedings, on what charge, and whether to dismiss a proceeding once brought. *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016). However, "the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's 'political beliefs.'" *United States v. Judd*, 1:21-cr-00040 (TNM) (D.D.C. Dec. 28, 2021) (citing *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 21 (D.D.C. 1999), aff'd 211 F.3d 137 (D.C. Cir. 2000)). The exercise of constitutional rights, such as First

Amendment rights, may not affect the government's decision to selectively prosecute a particular defendant. *Wayte,* 470 U.S. at 608; see also *Fedorov v. United States*, 600 A.2d 370, 607 (D.C. Cir. 1991) ("appellants have made a *prima facie* showing of a government policy that, by its own terms, more severely punishes those who exercise protected constitutional rights than those who do not"). When similarly situated individuals are not prosecuted, but "committed roughly the same crime under roughly the same circumstances," the defendant may compare his case to theirs to show the disparity. *See United States v. Khanu,* 664 F. Supp. 2d 28, 32 (D.D.C. 2009).

To lay the foundation for discovery on the issue of selective prosecution, a defendant must (1) make "a credible showing of different treatment of similarly situated persons," and, (2) show that the government's prosecutorial process had "a discriminatory purpose." *Armstrong*, 517 U.S. at 465. The defense may rely on indirect evidence to show the government's discriminatory intent. *United States v. Judd*, 1:21-cr-00040 (TNM) (D.D.C. Dec. 28, 2021); see also *United States v. Khanu*, 664 F. Supp. 2d 28, 33 (D.D.C. 2009).

Once the defendant meets his burden of proof, the standard for the government's production of discovery on selective prosecution is "rigorous." *Armstrong*, 517 U.S. at 457.

## II. Case Summary

On January 6, 2021, Mark Ibrahim was employed by the United States Drug Enforcement Administration as a federal law enforcement officer. While off-duty, Mr. Ibrahim attended the conservative political events in front of the Capitol. Mr. Ibrahim was in the company of an FBI source and Mr. Ibrahim's brother, also an off-duty federal law enforcement officer. Mr. Ibrahim brought with him and displayed two flags associated with conservative beliefs, the "Troutman

Flag" and the "Betsy Ross flag." He also took photos of the protest events and recorded some videos.

While outside of the Capitol, Mr. Ibrahim observed a young woman, who we now know as Ashli Babbitt, being rushed into an ambulance by paramedics, covered in blood. Later that evening, Mr. Ibrahim lamented her death and referred to the officer who shot Ms. Babbitt as a "trigger-happy cop."

Mr. Ibrahim did not go inside of the Capitol building, and he effectually precluded an FBI source from entering the Capitol building. Mr. Ibrahim observed protesters verbally harass some of the federal law enforcement officers, intervened on behalf of the officers, and effectuated a cessation of the harassment. Mr. Ibrahim then folded up his flags and put them in his backpack, explaining later in a voluntary interview with the government that he folded up his flags so that he is not seen as associated with the protesters, whom he observed as getting out of hand. Indeed, the selfie videos Mr. Ibrahim recorded on January 6 show him expressing disappointment with the crowd.

A later investigation revealed that both Mark Ibrahim and his brother carried into Washington DC and onto the grounds of the Capitol their department-issued firearms, concealed within concealed carry holsters, along with their credentials. The investigating agent conceded that DEA policy "███████████████████████████"[1] Both brothers were asked by the same investigator whether they observed fencing and signage restricting areas to the

---

[1] Pursuant to 21 U.S.C. § 878, DEA law enforcement officers are authorized to carry firearms without limitation to official duty. The DEA Agents Manual § 6122.11(B) *requires* agents to maintain access to firearms while off duty, stating that DEA agents "are required to be available for duty with little or no advance notice" and "must have ready access to their firearm in the event that they are recalled to duty." And, D.C. Code § 22–4505 permits federal police officers, who are otherwise authorized, to carry firearms in DC.

public prior to entry into those areas with their firearms and both brothers answered that they did not.

Mr. Ibrahim was criminally charged under 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) for carrying a firearm while allegedly entering restricted grounds, a felony offense punishable by up to 10 years in prison, in addition to a Capitol-specific version of this charge. He was also charged under the code section that criminalizes stepping on a federal erection, statue, or plant[2]; and for making a "materially false" statement that he never exposed his firearm, which in fact remained holstered in its concealed carry holster at all times with no evidence to the contrary. The two individuals who were with Mr. Ibrahim during the protest were not charged with any offenses. Additionally, the defendant has information and believes that other off-duty law enforcement officers who likely carried concealed firearms were present at the protest on January 6, yet none were charged.

The defense reached out to the government to request further discovery on the issue of selectiveness and requested information from the prosecutor regarding the charging decision of Mr. Ibrahim's brother. Undersigned counsel specifically noted that the request for additional discovery is material under *Armstrong*. The government refused to provide any discovery on the issue of selectiveness. *Cf. United States v. Hsia*, 24 F. Supp. 2d 33 (D.C. 1998) (the government, on its own, "provided evidence that it has not discriminated against [defendant] or acted from impermissible motives").

---

[2] 40 U.S.C. § 5104(d), which appears to have never been charged until January 6, 2021, states: "A person may not step or climb on, remove, or in any way injure any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf, in the Grounds." The local equivalent, D.C. Code § 10–503.15, also does not appear to have been previously charged.

Mr. Ibrahim asserts that he was selectively prosecuted based on his conservative political beliefs and outward expression thereof. See *United States v. Steele,* 461 F.2d 1148, 1152 (9th Cir. 1972) ("enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right"). At the same time, other similarly situated persons who did not express their conservative political beliefs but who engaged in identical conduct were not prosecuted — specifically, his brother and other off-duty officers who attended the January 6 protest but withheld political outwardness, and other off-duty federal officers.

Mr. Ibrahim compares his case to that of his brother. Mr. Ibrahim, who at the time was employed as a federal law enforcement agent, but while off-duty, attended the January 6 political protest in Washington DC. His brother, who at all times material was employed as a federal law enforcement agent, also attended the January 6 political protest in Washington DC, also while off-duty. Both gentlemen carried their department-issued firearms, concealed within concealed carry holsters, along with their credentials. Both gentlemen were asked by the same investigator whether they observed fencing and signage restricting areas to the public prior to entry into those areas and both brothers answered that they did not. Both brothers had a clean record, were employed in law enforcement, and served in the military. Mr. Ibrahim outwardly expressed his political beliefs while his brother did not. Mr. Ibrahim carried conservative flags, disagreed with the shooting of Ashli Babbitt, and told the investigator that he came to



Mr. Ibrahim and his brother on January 6.

support President Trump — his brother did not. Mr. Ibrahim was charged with a felony offense punishable by up to 10 years in prison for bringing his firearm into a restricted area while his brother was not charged with any criminal offense.

Mark Ibrahim's brother is not the only individual in the class of defendants not charged but Mr. Ibrahim does not have full details on the investigations of the other off-duty federal law enforcement officers as discovery on those cases has not been provided to Mr. Ibrahim. At a minimum, the defense can conclude that Mr. Ibrahim is the only off-duty federal law enforcement officer charged for his participation in the January 6 protest, yet he was not the only off-duty federal law enforcement officer who attended. See also Defense Exhibit 1 and Defense Exhibit 2.

### III. Argument

In cases where discovery on selective prosecution grounds was denied due to the insufficiency of evidence to meet the standard of *a credible showing* of different treatment of similarly situated persons and the government's discriminatory purpose, defendants relied on personal conclusions based on anecdotal evidence, or on comparisons to dissimilarly situated defendants in foreign jurisdictions. See, e.g., *Armstrong*, 517 U.S. at 470 (defendants cannot rely on "personal conclusions based on anecdotal evidence"); *Irish People*, 684 F.2d at 946 ("no showing that the selection was improperly motivated" and "no showing that there had been any selection at all"); *United States v. Stone*, 394 F. Supp. 3d 1 (D.C. 2019) (defendant did not compare his case to similarly situated persons and did not identify *any* plausible reason for

disparate charging decisions); *Judd*, 1:21-cr-00040 ("the Portland defendants are not similarly situated to [a January 6 defendant]").

Mark Ibrahim's case, however, is different.

In Mr. Ibrahim's case, the defense relies on evidence obtained directly from the government through standard discovery that shows the government had a selective and discriminatory purpose in seeking to prosecute Mr. Ibrahim for his political beliefs. The defense relies directly on the language used by the government amid the investigation. And, the defendant compares his prosecution to the elective non-prosecution of an individual similarly situated, an individual who was present with Mr. Ibrahim on January 6, at the protest in front of the Capitol, but whose political beliefs differ from those of Mr. Ibrahim.

The investigation of Mark Ibrahim was conducted by Special Agent Jason Higley ("SA Higley").

On March 9, 2021, SA Higley conducted interviews with Mr. Ibrahim's coworkers at the DEA. In two of the interviews, SA Higley inquired about Mr. Ibrahim's personal political beliefs, blurring the distinction between conservative politics and "extremism," or combining the two as if the same. In speaking to one of the DEA special agents, SA Higley inquired whether Mr. Ibrahim was an extremist, whether Mr. Ibrahim was in any sort of militia, *and* whether Mr. Ibrahim expressed any conservative ideas. SA Higley had no reason to believe that Mr. Ibrahim was in any way dangerous or "extreme," or that political conservatism, a set of beliefs held by half of this country, is in any way incriminating. Mr. Ibrahim's DEA coworker answered all of these questions in the negative, adding that Mark Ibrahim was instead, "kind of a regular guy." SA Higley's other interviews with Mr. Ibrahim's coworkers corroborated this description.

One week later, on March 16, 2021, Special Agent Jason Higley interviewed the brother of Mark Ibrahim. In the recorded interview, it is clear that SA Higley paid special attention to Mr. Ibrahim's politics — much of which was revealed through a discussion about classic U.S. flags. Below are some of SA Higley's questions and statements to Mr. Ibrahim's brother that revealed an underlying political investigation into Mr. Ibrahim's conservative beliefs and the federal agent's bias against conservatives:

- "And the flag that your brother is carrying, did he tell you why he was bringing that?"

- " That's a picture of your brother... but that's the Betsy Ross flag, right? 13 stars. Revolutionary War flag."

- "The white one is called a Troutman flag, and it's kind of the original state of Texas, Lone Star flag.  And it's the — a stupid trivia, but it's, like, it came from Georgia. A woman sewed it, and they sent a - it was a regiment or something, of people from Georgia over to fight with the Texans, for their independence.  But probably more information than you need to know.  But you can kind of see it written backwards there, the 'Liberty or Death.' Is there any significance to that statement?"

  - *Response by Mr. Ibrahim's brother:  "You know, in the JTTF, we had a Liberty or Death flag up, too.  So, no, I don't see a significance at all. I think that's just - that's a big American kind of a flag.  I mean, we like that.  We like our freedom. And we have it everywhere."*

- "I have not seen that particular flag in a lot of places, and I think that - like, the Gadsden flag, for example, the yellow one with the 'Don't Tread On Me' has been co-opted in some respects."

  - *Response by Mr. Ibrahim's brother: "Yeah. We have that flag at the JTTF, as well."*

- "But I think that at least online, and with some extremist groups, they take a slightly different view of it, and I didn't know if I should read anything into that particular flag, and I take it from your answer, the answer is no, I should not?"

- "I just am curious to know whether or not your brother has ever expressed to you any militant ideology."

  - *Response by Mr. Ibrahim's brother: "I have never heard him say anything extremist.  He is, you know, he is a big supporter of the United States, the Constitution, and the military.  But I have never heard him say anything even remotely extremist."*

A substantial amount of SA Higley's time was spent on attempting to decode or attempting to read nonexistent meaning into flags that are common to the conservative movement. And as can be seen from Mark Ibrahim's brother's response, the flags are common in law enforcement settings as well. But to SA Higley, who seemed particularly interested to find hidden meaning in the flags, the flags were something other than common.

---

A brief history of the flags found in conservative culture is in order.

The Betsy Ross flag is an early design of the US flag that features 13 stars. It is as common to American tradition as apple pie. Many Americans decorate their houses with Betsy Ross flags for the Fourth of July. This flag is classic Americana and many conservatives favor this flag as a symbol of traditional American values. The Betsy Ross flag was most recently used as a fashion design for Nike sneakers but was quickly withdrawn after political pressure from the left vilified the flag. Conservatives, in response, rallied behind the flag.[3] Mr. Ibrahim carried a Betsey Ross flag at the January 6 protest before the protest turned combative, at which point Mr. Ibrahim folded his flag and put it in his backpack to disassociate himself from the protesters.

The Troutman flag, also known as the First Lone Star Flag, is a classic Texas liberty flag that features the famous Lone Star that is now representative of the State of Texas, along with the words "Liberty or Death". It was designed in 1835 and was first raised as the national flag when the Texas Declaration of Independence was being signed. This flag is representative of independence and is popular among American service members and law enforcement, as well as conservative veterans. As Mr. Ibrahim's brother advised, this flag was raised at the FBI's Joint Terrorism Task



---

[3] Nicholas Wu, *Betsy Ross flag: Mitch McConnell tweets out flag that omits Kentucky*, USA Today (July 4, 2019), https://www.usatoday.com/story/news/politics/2019/07/04/mitch-mcconnell-tweets-out-betsy-ross-flag-which-missing-kentucky/1648855001; Will Martin, *Conservatives are boycotting Nike after it pulled a controversial US flag sneaker, and some want a 'not so woke' alternative,* Insider (July 3, 2019), https://www.businessinsider.com/nike-betsy-ross-sneaker-conservative-boycott-after-withdrawal-2019-7.



Force. The flag is also sold as Americana home decor and a garden flag. It's just "a big American kind of a flag," as Mr. Ibrahim's brother aptly characterized it. It should not be a surprise that Mr. Ibrahim, a conservative who served our country in Iraq and worked as a federal law enforcement officer, was fond of this flag. And, once the protest became disrespectful towards law enforcement, he folded up his flag and put it away.

The Gadsen flag, or the "Don't Tread on Me" rattlesnake flag, is an original Marine flag. In a December 27, 1775 letter was published in the *Pennsylvania Journal*, Benjamin Franklin wrote, "Having gained this intelligence, and recollecting that countries are sometimes represented by animals peculiar to them, it occurred to me that the Rattle-Snake is found in no other quarter of the world besides America, and may therefore have been chosen, on that account, to represent her." The rattlesnake and a message of independence were also printed on the $20 bill issued in 1778 by Georgia. The Gadsden flag was most recently used as a representation of the conservative Tea Party movement. Many conservatives favor this flag as a symbol of the American independent spirit, and Libertarians use this flag to represent their belief in American freedom. The Commonwealth of Virginia sells a vanity license plate modeled after the Gadsden flag. While Mr. Ibrahim was not carrying this flag and



this flag is not related to Mr. Ibrahim's case, this was a flag nonetheless mentioned by SA Higley as one of concern to him. In reality, the Gadsen flag is a classic American flag, and just like the others, representative of classic American freedom.

---

The federal agent's politically-biased and plainly absurd inquiry into historic American flags, the Betsy Ross flag, the Troutman flag, and the Gadsden flag — classic symbols of freedom— shocks the conscience.

SA Higley's remarks reveal political prejudice against conservatives. For perspective, SA Higley did not investigate President Joe Biden's administration for flying Betsy Ross flags during his inauguration. The Betsy Ross flag was only concerning to SA Higley when in the hands of a man who advised he came to the protest to support President Trump.



SA Higley also paid special attention to Mr. Ibrahim's beliefs regarding the shooting of an unarmed conservative protestor by federal law enforcement. And, SA Higley seemed very concerned about the late Ashli Babbitt, a veteran who served our country, being referred to as a patriot. SA Higley's remarks to Mr. Ibrahim's brother are as follows:

- "Mark describes Ashli Babbitt as a patriot.  In your view, was she a patriot?"

- "I think he also refers to the Capitol Police Officer that shot her as a 'trigger-happy cop.'  Do you recall that?… Would you agree with that sentiment?"

- "Did Mark ever say anything to you about Babbitt or the Officer that shot her?"

- "Did Mark ever express to you why he believed that the Officer that shot her was 'trigger-happy'?"

The day prior, SA Higley conducted a voluntary interview of Mark Ibrahim and asked similar questions. Thus, SA Higley, when asking Mr. Ibrahim's brother about the flags and political intentions, had already known that Mark Ibrahim was not in any way an extremist — by means of his investigation through both interviews of DEA coworkers and of Mr. Ibrahim himself.

In his interview of Mark Ibrahim, SA Higley first asked Mr. Ibrahim why he attended the protest. Mr. Ibrahim revealed his political beliefs in response, and stated that in part it was due to his support of President Trump, mentioning, "I think the President called - at that time - called for, you know, support…"

When asked about the meaning of his flags, Mr. Ibrahim explained, "I am a big fan of constitutional rights and freedom of speech." Mr. Ibrahim then explained that he put his flags away after he observed the protest transition into physical conflict.

Mark Ibrahim also noted that he felt "it's a shame how [the] conservative movement got hijacked."

SA Higley asked about Ashli Babbitt and Mr.

```
 8      MR. HIGLEY:  Well, I sort of saw the flag.
 9  Like, the Troutman flag.  The photograph,
10  right? Where, kind of, you're standing in front
11  of the barricades.  So, it seeing the Betsy
12  Ross flag, slash Troutman flag that you were
13  carrying with you.  You brought that along.
14  So, where did you get that?
15      MR. IBRAHIM:  I ordered it online.
16      MR. HIGLEY:  Okay.  And, like, why did you
17  bring it that day?
18      MR. IBRAHIM:  I am a big fan of
19  constitutional rights, and freedom of speech.
```
Transcription of Portion of SA Higley's
Interview of Mark Ibrahim

```
16      MR. IBRAHIM:  I don't - and I adamantly
17  reject the fact that it went violent.  I hate
18  the fact that it went violent.  And that's part
19  of the reason why I took my flag off the pole,
20  and put it away, and that's part of the reason
21  why I documented as much as I could, and that's
```

```
 4      MR. HIGLEY:  Okay.  But I did want to ask,
 5  one of the things that someone had described
 6  for me is, that you were talking about Ashli
 7  Babbitt, and referred to her as a Patriot, and
 8  that she had done nothing wrong.  Is that
 9  accurate?
10      MR. IBRAHIM:  I was speaking about her
11  Veteran service.  I believe that Veterans are
12  patriots.  I can't speak to her actions that
13  day, but the loss of life was sad.
```

```
14      MR. HIGLEY:  Right.  But again, in the
15  context, it would appear that you were talking
16  about Ashli Babbitt as a patriot, and I believe
17  you referred to the Police Officer that shot
18  her as a "trigger-happy cop."  Is that
19  accurate?
20      MR. IBRAHIM:  I believe so.
```
Transcription of Portion of SA Higley's
Interview of Mark Ibrahim

Ibrahim's "trigger-happy cop" comment.

But why was Mr. Ibrahim's opinion of the Ashli Babbitt shooting a point of investigation to begin with? A federal employee's opinion of the nature of an officer's on-duty discharge isn't criminal, it's an exercise of freedom of expression. In fact, the entire BLM movement was based on the public's disagreement with law enforcement's discharge of firearms, and the federal government welcomed the conversation, describing criticism of law enforcement as "politically and culturally salient."[4] Mr. Ibrahim's divergent opinion on the validity of the killing of an unarmed conservative woman by law enforcement certainly cannot receive deeper scrutiny than a federal employee's opinion on the death of George Floyd without raising disparate treatment concerns— and it certainly has no bearing on the trespass charges against Mr. Ibrahim.[5] The only clear difference between Mr. Ibrahim and the other federal agents and employees is politics — a concern that unarmed veteran Ashli Babbitt was unlawfully killed by police is associated with conservative beliefs, and these are the precise beliefs that SA Higley was probing in his criminal investigation of Mr. Ibrahim.[6]

---

[4] Memorandum, *Black Lives Matter and the Hatch Act,* U.S. OFFICE OF SPECIAL COUNSEL (July 14, 2020) available at https://federalnewsnetwork.com/wp-content/uploads/2020/07/071420_osc_blm_hatchact_FNN.pdf.

[5] It is noteworthy that of all the federal employees who supported and attended BLM protests in 2020, political protests associated with the left-leaning political assessment of shootings by law enforcement, 570 of which had turned violent, none were charged. See Michael Levenson, *Federal Employees Can Express Support for Black Lives Matter, Watchdog Says*, New York Times, (July 16, 2020), https://www.nytimes.com/2020/07/16/us/federal-employees-black-lives-matter.html; US Crisis Monitor, *Demonstrations and Political Violence in America: New Data for Summer 2020*, ACLED Data, https://acleddata.com/2020/09/03/demonstrations-political-violence-in-america-new-data-for-summer-2020; Press Release, *Over 300 People Facing Federal Charges For Crimes Committed During Nationwide Demonstrations*, Department of Justice, (September 24, 2020), https://www.justice.gov/opa/pr/over-300-people-facing-federal-charges-crimes-committed-during-nationwide-demonstrations.

[6] See, e.g., Scott Glover, *To some, she's a patriot. To others, a domestic terrorist. How the memory of a woman killed in the Capitol riot got so politicized*, CNN (June 18, 2021) https://www.cnn.com/2021/06/18/politics/ashli-babbitt-capitol-hill-riot-death-invs/index.html.

Nothing in his investigation indicated to SA Higley then, nor now, that Mr. Ibrahim's conservative political beliefs are in any way "extremist" or criminal. Classic American flags are not "extremist." Expression of political conservatism is not "extremist." A critical opinion about the shooting death of an unarmed woman by an armed man is not "extremist." Mr. Ibrahim's careful and considerate removal of his flags is actually the opposite of "extremist." Why, then, did SA Higley decide to devote such a substantial amount of time to policing Mr. Ibrahim's conservatism, his flags, and his beliefs about Ashli Babbitt, while foregoing the prosecution of his brother?

SA Higley, as can be derived from his choice of questions and comments, was investigating Mr. Ibrahim's conservative beliefs.[7] This is even more evident when considered against the backdrop of the case of Mr. Ibrahim's brother.

Mr. Ibrahim's brother's notable deviation from Mark is that he did not outwardly express the same political beliefs, nor did he call Ashli Babbitt a patriot, or accuse the officer who shot her of wrongdoing. Mr. Ibrahim's brother stated that he believed that the federal officer who shot Ms. Babbitt rightfully used deadly force. He carried no flags. He expressed no conservative beliefs. Mr. Ibrahim's brother was not charged — even though he too had his department-issued firearm on his person. Mr. Ibrahim and his brother attended the event together, walked together, stood together. He could have been charged under most of the same code sections as Mr. Ibrahim.

_____

[7] A letter from Rep. Jim Jordan, dated June 7, 2022, cites multiple federal whistleblowers alleging "a 'purge' of FBI employees holding conservative views." The description of the basis on which these federal employees are being discriminated against is eerily similar to the basis alleged by Mr. Ibrahim — "participation in protected First Amendment activity." See Defense Exhibit 1. This letter was following up on a May 6, 2022, letter, in which Rep. Jordan stated that he has "serious concerns that the FBI appears to be retaliating against employees for engaging in political speech disfavored by FBI leadership." See Defense Exhibit 2. In Mr. Ibrahim's case, the retaliation is by DOJ, and it is not just a purge, it's persecutory prosecution.

Mark Ibrahim is aware of other off-duty federal officers who attended the January 6

protest, who likely carried firearms in compliance with their agency's off-duty carry policy, but

who were not charged. *See also* Defense Exhibits 1 and 2. These individuals, based on

knowledge and belief, did not bring any flags nor exhibit any political expression other than

attendance.

The outward expression of conservative beliefs appears to have been the tipping point for

Mr. Ibrahim's charges. In seeking an indictment of Mr. Ibrahim, while testifying before the grand

jury, SA Higley noted that he believed, "███████████████████████████████

████████████████████████████████████████████████████

████" This hypothesis does not fall into any element of offense against Mr. Ibrahim — but it

reveals that conservatism as an *implied* crime appears at the forefront of the government's

underlying motivation to prosecute Mr. Ibrahim.

It is the manner in which the government conducted its investigation in this case — the

political points of concentration in their investigation — that have yielded considerable colorable

evidence of the government's politically-motivated decision to wield or reserve criminal charges.

As a result, Mr. Ibrahim is charged while his brother, and others like his brother, are not.

The defendant is thus seeking discovery on the issue of selective prosecution. At this

stage, he need only show "some evidence tending to show the existence of the essential elements

of" of a selective prosecution claim; or "at least a colorable claim" of selective prosecution.

*Armstrong,* 517 U.S. at 469-70; *Irish People, Inc.*, 684 F.2d at 932. The defendant has met his

burden.

In terms of practically available evidence of selective prosecution, the evidence presented here is as close as a defendant can reasonably reach without exceeding standard discovery. The government's self-recorded behavior on their road to prosecution is the extent of colorable evidence that a defendant can access without deeper discovery on the issue — discovery that would require either court intervention or voluntary production by the government, which in this case has suspiciously been declined by the government. *Cf. U.S. Attorney's Office General Discovery Policy* (2015) (promising production of "discovery beyond what is required under Rule 16 and other governing federal law"); *United States v. Hsia*, 24 F. Supp. 2d 33 (D.C. 1998) (the government voluntarily produced evidence showing that they had not discriminated against the defendant).

Unlike the defendant in *Judd*, where discovery on selectiveness was denied due to a January 6 defendant comparing himself to Portland defendants, Mr. Ibrahim only compares himself to similarly situated January 6 attendees. See *Judd*, 1:21-cr-00040. Mr. Ibrahim compares himself to armed, off-duty federal law enforcement officers — individuals who could have been but were not charged for offenses on which he was indicted — similarly situated individuals.

What is clear is the government's concentration on the defendant's display of conservative politics. This is inherently suspect. See *United States v. Steele,* 461 F.2d 1148, 1152 (9th Cir. 1972) ("enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right").

**IV. Defendant's Discovery Requests**

Defendant seeks discovery of the government's selective prosecution practices. As the Supreme Court noted in *Armstrong*, the discovery ordered must be "rigorous." 517 U.S. at 468.

Defendant's particular discovery requests are as follows:

- All records of training, classes and their descriptions, certifications, and materials on which SA Jason Higley was trained or educated about politics, flags, patriotism, militant ideology, extremism, race relations, and other ideologies.

- Prosecution guidelines, policies, and procedures on decisions regarding the prosecution of federal law enforcement officers; and, data on cases declined in this category.

- Prosecution guidelines, policies, and procedures on decisions regarding the prosecution of January 6 cases for individuals who did not enter the Capitol building; and, data on cases declined in this category.

- Prosecution guidelines, policies, and procedures on decisions regarding the prosecution of federal employees who express conservative beliefs or beliefs in support of Donald Trump.

- All records, recordings, documents, notes, memoranda, communications, and correspondences referencing any deliberations or decisions to charge or indict Mark Ibrahim.

- All records, recordings, documents, notes, memoranda, communications, and correspondences regarding the non-prosecution of, or charging decisions about, Michael Ibrahim.
- All records, recordings, documents, notes, memoranda, communications, and correspondences regarding the non-prosecution of, or charging decisions related to, off-duty federal police officers who were present at or in the Capitol and its grounds on January 6, and data on cases declined in this category.
- All records, recordings, documents, notes, memoranda, communications, and correspondences regarding the investigation and charging decisions related to off-duty federal police officers investigated for off-duty carry in any restricted federal areas over the past 10 years; and data on cases declined in this category.
- Disciplinary records, reprimands, and notices of concern for Jason Highley.

The government should be further ordered to produce any evidence that is material to the issue of selective prosecution.

With regard to any concerns that the government might have about the production of sensitive data or records, the court is reminded that there is a Protective Order guiding discovery in this matter and that the government may choose to produce such records to the defense through sensitivity designation under the Protective Order.

## V. Conclusion

Mr. Ibrahim has made a "credible showing of different treatment of similarly situated persons." See *Armstrong*, 517 U.S. at 470. Mr. Ibrahim demonstrated that another federal law

enforcement agent who also attended the January 6 political protest, who also admitted to

bringing his department-issued firearm, and who was by his side during the events, was not

criminally prosecuted under 18 U.S.C. § 1752 or with any trespass offense. Mr. Ibrahim then

showed evidence that the investigation of his conduct included considerable inquiry into his

conservative political beliefs, which are not elements of any criminal offense, certainly not of §

1752. The individuals not criminally charged had not expressed outward conservative political

beliefs. Mr. Ibrahim has presented "some evidence" showing of the discriminatory effect of the

government's charging policy based on political beliefs, relying on words used by the

investigating agent. See *Armstrong,* 517 U.S. at 469-70; *Att'y Gen. v. Irish People, Inc.*, 684 F.2d

928, 932 (D.C. Cir. 1982). The defense, therefore, has met its initial burden on both prongs of a

selective prosecution claim, and now seeks discovery of the government's charging decisions and

discriminatory investigative policies.


Date: June 9, 2022

                                               Respectfully submitted,
                                               By Counsel:

                                               _____/s/_____
                                               Marina Medvin, Esq.
                                               *Counsel for Defendant*
                                               MEDVIN LAW PLC
                                               916 Prince Street
                                               Alexandria, Virginia 22314
                                               Tel:  888.886.4127
                                             Email: contact@medvinlaw.com

## <u>CERTIFICATE OF SERVICE FOR CM/ECF</u>

     I hereby certify that on June 9, 2022, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_____/s/_____
Marina Medvin, Esq.
