UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 1:21-cr-00496-TJK-1 |
| : | |
| : | |
| MARK S. IBRAHIM : | |
| : | |
| Defendant. : | |

**OPPOSITION TO MOTION TO DISMISS THE INDICTMENT – MENS REA**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant Mark Ibrahim's Motion to Dismiss Count Three of the Indictment based upon his claim that the indictment "under 40 U.S.C. § 5104(e)(1)(A)(i), a felony that lacks a scienter component, alleges felonious strict liability for otherwise innocent and constitutionally protected conduct."  Although Defendant is correct that he is charged with a felony that lacks a scienter requirement, he is wrong that his behavior is "innocent and constitutionally protected conduct."  Moreover, the indictment tracks the language of the 40 U.S.C. § 5104(e)(1)(A)(i), and the defendant's conduct falls within the prohibitions of that statute.  Nor does the statute violate the Second Amendment.  Consequently, defendant's attack on Count Three of the indictment lacks merit.

**FACTUAL BACKGROUND**

A. Relevant Facts

Defendant admits and acknowledges that he was present on Capitol Grounds with a firearm on January 6, 2021, *s*ee ECF No. 48, pg. 4, which photographic evidence bears out.



In his interview with law-enforcement, defendant admitted to being present on Capitol Grounds armed with his service firearm.   Defendant has previously claimed that he traveled to Washington D.C. to attend the rally at the behest of a friend and to witness an historic event. ECF No. 21, pg. 8.

At approximately 1:09 p.m., Ibrahim was photographed displaying his DEA badge and firearm in an area near the Peace Circle.   The Peace Circle was the area of the initial breach of the Capitol barricades.   The Capitol barricades were breached at the Peace Circle at approximately 12:55 pm.



Defendant, his brother, and friend arrived at the Peace Circle at approximately 1:22 pm, where his friend took a photo of the defendant in front of the Peace Circle.



### B.     Statutory Background

In 1967, Congress enacted the provision at issue in this motion, 40 U.S.C. § 5104(e)(1)(A).   In so doing, Congress amended existing prohibitions against certain conduct on

3

Capitol Grounds and in Capitol buildings.   The amendment to 40 U.S.C. § 5104(e)(1)(A)(i) did not happen in a vacuum.   On March 1, 1954, while House Members gathered on the House Floor for an upcoming vote, three men and one woman entered the visitor's gallery above the chamber and quietly took their seats. All four belonged to the Puerto Rican Nationalist Party and only hours earlier had traveled from New York City to Washington, D.C.   The Capitol had few security protocols at the time, and the four Puerto Rican nationalists entered the gallery armed with handguns.   Around 2:30 p.m. they indiscriminately opened fire onto the House Floor and unfurled a Puerto Rican flag in a violent act of protest meant to draw attention to their demand for Puerto Rico's immediate independence.   *See* https://history.house.gov/Oral-History/Events/1954-Shooting/.   Representatives discussed recent incidents where Nazis and others acted violently and disrupted the Congressional proceedings.

In 1967, the United States Congress amended 40 U.S.C. § 5104(e)(1)(A)(i) to provide for more stringent safety laws in and around the Capitol, and included the felony firearms provision challenged by defendant. Prior to the amendment, the law provided:

> SEC. 6. It is forbidden to discharge any firearm, firework or explosive, set fire to any combustible, make any harangue or oration, or utter loud, threatening, or abusive language in said United States Capitol Grounds.

79th Cong. 2nd Sess. – Ch. 707 - July 31, 1946.   On October 20, 1967, the House approved S. 2310 "An act to provide more effectively for the regulation of the use of, and for the preservation of safety and order within, the U.S. Capitol Buildings and the U.S. Capitol Grounds, and for other purposes. Cong. Rec. 29593.   The current language provides, in part:

> (1) Firearms, dangerous weapons, explosives, or incendiary devices. An individual or group of individuals—
>
> (A) except as authorized by regulations prescribed by the Capitol Police Board—

4

> (i) may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device; . . .

40 U.S.C. § 5104(e)(1)(A)(i).

The legislative history indicates that the United States Congress enacted a narrowly tailored strict liability prohibition for possessing firearms on Capitol Grounds. One dissenter, Congressman Jerome R. Waldie, observed that "mere possession" of a firearm within the Capitol building and grounds was a felony:

> Mr. WALDIE. The only reply that I would make to the gentleman is that there is no defense possible. The person could say that he carries the weapon because he has a permit to carry it and is carrying it across the country for the defense of his family. But that is no defense because the mere possession is a felony. There is no prescribed intent in the bill as it is written. The amendment I propose would give them a defense.
>
> Mr. FARBSTEIN. I would be satisfied to go along with an amendment to make it a misdemeanor and to say that no intent is necessary. But I do believe that the mere possession of a dangerous weapon should be treated as a crime. As I said earlier, any explanation or any onus should be upon the one who carries the gun. We should not be compelled to prove that he was carrying it for any purpose other than an ulterior purpose.
>
> So, as I said earlier, I think if there is to be any amendment, it might be in the sense that mere possession of a dangerous weapon should be a crime although it may well be a misdemeanor.
>
> Mr. FALLON. Mr. Chairman, I rise in opposition to the amendment.
>
> Mr. Chairman, I do not believe the language offered by the gentleman from California is necessary. In fact, it would have a tendency to weaken the bill.

Cong. Rec. 29390 (daily ed. Oct. 19, 1967) (statement of Reps. Waldie, Farbstein and Fallon).

## ARGUMENT

The defendant launches two principal attacks on Count Three. First, he presses a "[s]tatutory challenge," primarily arguing that the lack of a *mens rea* in 40 U.S.C. § 5104(e)(1)(A) renders the charge against him insufficient. That argument is premature, and, in any event, lacks merit. Second, the defendant contends that Section 5104(e)(1)(A) violates the Second Amendment. That argument is also flawed.

**I.    The defendant's statutory challenge is premature, and, in any event, lacks merit.**

The defendant attacks Section 5104(e)(1)(A), which makes it unlawful to carry a firearm on Capitol grounds or in any Capitol building, as impermissibly lacking any *mens rea*. In the defendant's view, it therefore follows that Count Three, which charges a violation of Section 5104(e)(1)(A), is invalid and should be dismissed. But the conclusion does not follow from the defendant's premise, and that premise is faulty because Congress may enact a strict liability criminal prohibition, and the evidence indicates Congress did so in Section 5104(e)(1)(A). But this Court need not and should not reach that question here, as the sole question at this point in the litigation is the validity of the Section 5104(e)(1)(A) charge.[1] Because the indictment adequately charged such a violation, the defendant's motion should be denied.

**A. Count Three adequately charges a violation of Section 5104(e)(1)(A).**

Although the defendant focuses on whether Congress intended to enact a strict liability criminal prohibition in Section 5104(e)(1)(A), the central question is whether Count Three

---

[1] The government would not object to the Court setting a separate briefing schedule to address whether Section 5104(e)(1)(A) should be interpreted to contains a *mens rea* requirement for purposes of jury instructions in this case.

adequately charges a violation of that provision.  It does.

An indictment satisfies the Federal Rules of Criminal Procedure if it contains "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1); *see United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (per curiam) (indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed").  An indictment complies with the Constitution where it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and enables a defendant "to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).  An "indictment parroting the language of a federal criminal statute is often sufficient." *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007).

The Section 5104(e)(1)(A) count in this case satisfies those requirements.  Count Three "echoes the operative statutory text"—alleging the defendant unlawfully carried a firearm on Capitol grounds, "while also specifying the time and place of the offense," namely, January 6, 2021, in the District of Columbia.  *See United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018); App.55, 85-86, 444.  An indictment's validity does not turn on "whether it could have been made more definite and certain," especially where, as here, the indictment identifies conduct that occurred on a single day in connection with an infamous attack on the U.S. Capitol such that it is "inconceivable" that "the defendants could possibly be misled as to the offense with which they st[and] charged." *United States v. Debrow*, 346 U.S. 374, 376, 378 (1953) (internal quotation marks omitted).  In that respect, the Section 5104(e)(1)(A) count here does not resemble the charges in *United States v. Hillie,* 227 F.Supp.3d 57 (D.D.C. 2017), which the

7

defendant invokes (ECF No. 48 at 16), and which involved allegations that the defendant merely "did something involving visual depictions of sexually explicit conduct of a minor . . . during periods of time that span two to three years," 227 F.Supp.3d at 72.

The defendant's sole attack on Count Three's language (ECF No. 48 at 15) is that it fails to include the phrase "except as authorized by regulations prescribed by the Capitol Police Board." Citing no legal authority, the defendant describes this phrase as an "indispensable element" (*id.*). The language's plain terms refute that description; the phrase clearly sets out an exception that would permit someone who was otherwise engaging in conduct that violated Section 5104(e)(1)(A) to claim that his or her conduct was in fact "authorized" and therefore not criminal. And it is has long been the law that "an indictment . . . founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere." *McKelvey v. United States*, 260 U.S. 353 357 (1922). Count Three is therefore adequately pled.

**B. The defendant's *mens rea* challenge is premature and flawed.**

The defendant purports to challenge the interpretation of Section 5104(e)(1)(A), and specifically, whether the provision should be read to include a *mens rea* component. Whether Section 5104(e)(1)(A) is interpreted to encompass a *mens rea* or not provides no basis to dismiss Count Three before trial. Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a full proffer of evidence," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005), which has

not occurred here.   Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial."   *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010). Whether the defendant acted with or without any particular mental state while possessing a firearm on Capitol grounds is not a question for this stage of the litigation.

Here, the Section 5104(e)(1)(A) count puts the defendant on notice as to the charge against which he must defend himself, while also encompassing the broader theory that a defendant violates Section 5104(e)(1)(A) through possession of firearm on Capitol grounds with no accompanying mental state *and* the narrower theory that the defendant must have had some *mens rea* while carrying a firearm on Capitol grounds.   Even were this Court to adopt the defendant's narrower reading, such a reading is not a basis for dismissal; instead, this Court would properly enforce that limitation by permitting conviction on that basis alone.   *See United States v. Ali*, 885 F.Supp.2d 17, 33 (D.D.C. 2012) (limiting the government's aiding and abetting theory under 18 U.S.C. § 1651 to acts of piracy committed while the defendant was on the high seas but not dismissing the count), *reversed in part*, 718 F.3d 929 (D.C. Cir. 2013) (disagreeing with the district court's limitation).

In any event, the defendant's claim that Section 5104(e)(1)(A) must be read to include a *mens rea* is flawed.   Although "offenses that require no *mens rea* generally are disfavored," strict criminal liability offenses are not prohibited by the Constitution.   *Staples v. United States*, 511 U.S. 600, 606 (1994).   Rather, "some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime."   *Id*. (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 438 (1978)); *Morissette v. United States*, 342 U.S. 246,

263 (1952).   In short, while it is "traditional to assume" that Congress intends to require the government prove a defendant's *mens rea*, Congress may in some statutes "manifest[] a contrary intention." *United States v. Harris*, 959 F.2d 246, 257 (D.C. Cir. 1992); *see United States v. Nofziger*, 878 F.2d 442, 452 (D.C. Cir. 1989).[2]

There is considerable evidence indicating that Congress had just such an intent when it enacted Section 5104(e)(1)(A).   Certainly the provision itself bears no *mens rea* term such as "knowingly" or "willfully," and it would be counterintuitive to conclude that Congress simply "made a mistake," *see* ECF No. 48 at 15, when those very terms appear one provision away in Section 5104(e)(2).   Moreover, the lawmakers who passed Section 5104(e)(1)(A) extensively debated the provision, observing that it imposed strict liability, including potentially on Members of Congress who possessed firearms.[3]   *See, e.g.*, Cong. Rec. 29390 (daily ed. Oct. 19, 1967)

---

[2] Strict criminal liability statutes are common under state law.  *See State v. Thomas*, 313 Kan. 660, 663 (Kan. 2021) (strict liability rape offense resulting in 620 month sentence does not violate due process), *Commonwealth v. Wilbur W., a juvenile*, 479 Mass. 397 (Mass. 2018) (imposition of strict liability for statutory rape does not violate Due Process), *Fleming v. State*, 376 S.W.3d 854 (Tx. Ct. App. 2012) (The absence of a *mens rea* or mistake-of-age component to statutory rape offense did not violate defendant's substantive due process rights. There was no fundamental right to a *mens rea* or mistake-of-age component), *State v. Genson*, 59 Kan. App. 2d 190 (Kan. Ct. App. 2020) (Kansas strict liability sex offender registry law upheld); *State v. Maldonado*, 137 N.J. 536, 548 (N.J. 1994) ("Although the justifications may differ, case after case, almost without exception, has upheld the power of the states to impose strict criminal liability not only in a regulatory setting but for serious offenses as well").   In fact, states have also enacted strict liability criminal firearm possession laws, and they have been upheld against challenges that they impermissibly create a crime with no *mens rea* requirement.  *See Esteban v. Commonwealth*, 266 Va. 605 (Va. 2003).  *See also* Bilionis, *Process, the Constitution, and Substantive Criminal Law*, 96 Mich. L. Rev. 1269 (1998).   Historically, in certain crimes that "predate the regulatory state (bigamy, adultery, and statutory rape), and in the felony-murder area, the fact that an offense was not committed intentionally, recklessly, or negligently has traditionally not been a defense." Mark Kelman, *Strict Liability: An Unorthodox View*, in 4 Encyclopedia of Crime and Justice 1512, 1517 (Sanford H. Kadish ed., 1983).

3 Congress ultimately included an exemption for government officials acting in the lawful

(statement of Rep. Anderson); Hearing before the Committee on Public Works, Sept. 28, 1967, at 12 (explaining Section 5104(e)(1)(A)'s "theory" that "carrying a firearm into the Capitol Building was such a dangerous act that it was not necessary to spell out willfulness") (statement of U.S. Attorney Bress); *see also id.* at 13 (explaining that "the Senate committee saw fit to remove the requirement that carrying the weapon be knowingly done") (statement of U.S. Attorney Bress). The defendant is thus mistaken (ECF No. 48 at 11) when he claims that no one in Congress intended or understood that Section 5104(e)(1)(A) would function as a strict liability criminal provision.

Whether Congress intended to enact a strict liability provision in Section 5104(e)(1)(A) differs from whether it "lack[ed] the power" to criminalize "possession of a gun without proof of scienter." *United States v. Class*, 930 F.3d 460, 469 (D.C. Cir. 2019). In *Class*, the court rejected the defendant's constitutional challenges to Section 5104(e)(1), but did not address how "the lack of a scienter requirement . . . might raise questions of statutory interpretation." *Id.* In *Rehaif v. United States*, 139 S. Ct. 2191 (2019), for example, the Supreme Court held that the government must prove the defendant knew he possessed a firearm and that he "belonged to the relevant category of persons barred from possessing a firearm." *Id.* at 2200. *Rehaif*, in turn, drew on the reasoning in *Staples v. United States*, 511 U.S. 600 (1994), where the Supreme

---

discharge of their official duties. *See* 40 U.S.C. § 5104(e)(3). Attached as Exhibit A is the House debate contained in the Congressional Record and vote for the amended law from October 19, 1967. Attached as Exhibit B is the Senate debate contained in the Congressional Record and vote from October 5, 1967. Attached as Exhibit C is the Hearing transcript before the House Committee on Public Works dated September 28, 1967. Attached as Exhibit D is the Senate Report of the Committee on Public Works to Accompany the Amendment. Attached as Exhibit E is the House Report together with Minority Views to Accompany the Amendment. Attached as Exhibit F is the Senate Subcommittee on Public Building and Grounds hearing transcript.

11

Court held that the government had to prove that the defendant "knew of the features of his [gun] that brought it within the scope of the [prohibition]." *Id.* at 619. The court in *Class* found the "parallel" between the statutes at issue in *Rehaif* and *Staples* "clear" when applied to Section 5104(e)(1)(A)'s "ban on possession of a gun in a particular place." 930 F.3d at 469. Whether that "parallel" requires importing into Section 5104(e)(1)(A) a *mens rea* requirement that the government must prove that a defendant charged with violation of that statute knew that he possessed a firearm and knew that he was on Capitol grounds is not a question the Court needs to or should decide at this point. To be sure, it will be important to resolve that interpretive question in the jury instructions, and potentially before trial to the extent it enables the parties to prepare for trial accordingly. But the defendant's motion to dismiss Count Three does not turn on resolution of that question.

## II.     Defendant's Second Amendment challenge is unavailing.

Defendant also claims that Section 5104(e)(1)(A)(i) violates the Second Amendment's protection on the right to keep and bear arms. ECF 48 at 16-24. He is incorrect. As the Supreme Court has explained, "[T]he Second Amendment right is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The *Heller* opinion made clear that it "should not be taken to cast doubt on longstanding prohibitions," including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.*

Relying on *Heller*, the D.C. Circuit in *Class* rejected a Second Amendment challenge to Section 5104(e)(1), the same provision at issue here. *Class*, 930 F.3d at 463-64. The court held that the part of the Capitol grounds at issue there—the Maryland Avenue parking lot—was "sufficiently integrated with the Capitol" for *Heller I*'s sensitive places exception to apply." *Id.*

12

at 464. As the Court explained, "[w]ith respect to the Capitol itself, there are few, if any, government buildings more 'sensitive' than the national legislature at the very seat of its operations." *Id.* at 463 (quotation omitted). And although the court observed that "there is surely some outer bound on the distance Congress could extend the area of protection around the Capitol without raising Second Amendment concerns, "Congress has not exceeded it here" in enacting Section 5104(e)(1). *Id.* Additionally, the D.C. Circuit observed that, "as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property." *Id.* (citing *Adderly v. Florida*, 385 U.S. 39, 47 (1966)).

The Supreme Court addressed the Second Amendment recently in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), striking down a New York law that prohibited law-abiding citizens from carrying firearms in public without a showing of a special need for self-defense. *Bruen* rejected the "two-step approach" that courts of appeals had developed to analyze Second Amendment challenges. *Id.* at 2126. And, relying on *Heller*, it explained that the following standard applies to Second Amendment claims: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The Court explained that, when confronting present-day firearm regulations that "were unimaginable at the founding," the historical inquiry "will often involve reasoning by analogy." *Id.* at 2132. This "analogical reasoning requires only that the government identify a well-established and representative *historical analogue*, not a historical *twin*." *Id.* at 2133.

*Bruen* did not call into question *Heller*'s discussion of firearm prohibitions in "sensitive

13

places."   In fact, *Bruen* specifically explained how modern laws forbidding the carrying of firearms in sensitive places were an "example" of how a "modern-day regulation" that is "not a dead ringer for historical precursors . . . still may be analogous enough to pass constitutional muster."   *Bruen*, 142 S. Ct. at 2133.   *Bruen* explained: "Although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions."   *Id.* (citing D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018), and Brief for Independent Institute as *Amicus Curiae* 11-17).   The Court therefore said it could "assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment."   *Id.*   "And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive place are constitutionally permissible."   *Id.*   Because the U.S. Capitol Building is a "government building[]," *Heller*, 554 U.S. at 626, and houses a "legislative assembl[y]," *Bruen*, 142 S. Ct. at 2133, it clearly a sensitive place where firearm carrying may be prohibited under *Heller* and *Bruen*.   And the government need not identify specific historical statutes that are analogous because the Supreme Court has already considered the historical record and found it "settled" that "arms carrying" can be "prohibited consistent with the Second Amendment" in such places.   *Bruen*, 142 S. Ct. at 2133.   Moreover, multiple courts (other than the D.C. Circuit in *Class*) have upheld prohibitions on carrying firearms in sensitive places after *Heller*.   *See United States v. Dorosan*, 350 F. App'x 874 (1st Cir. 2009) (unpublished); *United States v. Davis*, 304 F. App'x 473, 474 (9th Cir. 2008)

14

(unpublished); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 38 F. Supp. 3d 1365, 1371-76 (N.D. Ga. 2014), *aff'd*, 788 F.3d 1318 (11th Cir. 2015); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790-91 (E.D. Va. 2009), *aff'd*, 638 F.3d 458 (4th Cir. 2011); *Davis v. Bragg*, No. 09-2892, 2009 WL 10740797, at *4 (C.D. Cal. Dec. 21, 2009); and *United States v. Lewis*, No. 2008-05, 2008 WL 5412013, at *1-2 (D.V.I. Dec. 24, 2008).

The only remaining question is whether the U.S. Capitol *grounds* can be treated as a sensitive place along with the Capitol *building*. On that point, *Class* is controlling. If the Maryland Avenue parking lot, which was "less than 1,000 feet away from the entrance to the Capitol, and a block away from the Rayburn House Office Building," is a sensitive place for Second Amendment purposes, then there can be little question that the steps of the Capitol building are a sensitive place. *Class*, 930 F.3d at 464. And *Bruen* does not call this aspect of *Class* into question. *Bruen* rejected the argument that New York could "effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Bruen*, 142 S. Ct. at 2134. But *Bruen* did not suggest that the federal government cannot prohibit firearm carrying on the very steps of the U.S. Capitol. Nor did *Bruen* say anything that would undermine *Class*'s conclusion that the federal government possesses a right similar to private landowners of prohibiting firearm possession on its property. In short, Defendant cannot show that Section 5104(e)(1) is unconstitutional either as applied to him or on its face. This Court should reject his Second Amendment challenge.

WHEREFORE, the government respectfully requests that this Court deny Defendant's motion to dismiss.

        Respectfully submitted,

        MATTHEW M. GRAVES
        UNITED STATES ATTORNEY
        DC BAR NO. 481052

By:       /s/
        James D. Peterson
        Trial Attorney
        United States Department of Justice
        Special Assistant United States Attorney – D.C.
        VA Bar 35373
        1331 F Street N.W.
        6th Floor
        Washington, D.C. 20530
        (202) 353-0796
        James.d.peterson@usdoj.gov